Roger Sullivan
Allan M. McGarvey
John F. Lacey
McGarvey, Heberling, Sullivan & Lacey, P.C.
345 First Avenue East
Kalispell, MT 59901
(406) 752-5566

Attorneys for Plaintiff

**FILED** CLERK OF DISTRICT COURT
RAVE MCWILLIAMS

2016 MAY 11 PM 2: 28

AUG 29 2017

Clerk, U S Courts
District Of Montana
Great Falls Division

FILED

BY _____ DEPUTY

511474

## MONTANA EIGHTH JUDICIAL DISTRICT, CASCADE COUNTY

SHAWN C. TONG,

Plaintiff,

v.

BNSF RAILWAY COMPANY, a
Delaware corporation; JOHN SWING;
ROBINSON INSULATION COMPANY,
a Montana Corporation for profit; and
DOES A-Z,

Defendants.

CAUSE NO. **CDV - 16 - 0412**

JOHN A. KUTZMAN
CV·17-8ə·GF·BMM

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

## PARTIES

1.    Plaintiff Shawn C. Tong, is a resident of Spokane, Washington.

2.    Defendant BNSF Railway Company (BNSF) is a corporation organized and
existing under the laws of the State of Delaware and is engaged in interstate commerce
with its headquarters in Fort Worth, Texas.

3.    Defendant John Swing was a managing agent for BNSF in Libby, Montana
and is a resident of Lincoln County, Montana.

4.    Robinson Insulation Company (Robinson Insulation) is or was a Montana
business corporation for profit with its principal place of business in Great Falls, Cascade
County, Montana where Robinson Insulation operated a vermiculite expansion plant.
Robinson Insulation engaged in conduct that resulted in the accrual of this tort action in
Montana.

5.    Does A - Z are corporations or persons, whose identities are unknown at

this time, and whose negligence and wrongful acts caused asbestos related bodily injuries in the Plaintiff.

6.      Plaintiff will seek to amend his complaint when the true names and capacities of Does A - Z are ascertained.

7.      Venue in this action is proper in Cascade County, Montana, because at least one of the Defendants, Robinson Insulation, engaged in tortious conduct within Cascade County and is a resident of Cascade County.

8.      This Complaint is filed to protect statutes of limitations.

## GENERAL ALLEGATIONS

9.      In 1963 W.R. Grace & Co. (Grace) purchased an existing vermiculite mine and mill in Libby, Montana (the Mine) from the Zonolite Company (Zonolite), in the process assuming all liabilities of Zonolite. Grace operated the Mine from 1963 until 1990. The vermiculite was intermixed with a highly toxic form of asbestos. The extraction of vermiculite from the ground and processing of it generated substantial airborne dust containing asbestos. The dust was produced at the mine site, as well as in the town of Libby where expansion, bagging, storage and transport facilities were located.

10.     The Plaintiff was a Grace/Zonolite, railroad or logger/lumbermill worker, contractor, homeowner or member/resident of the community of Libby, Montana, and/or the child or spouse of said person, and as such were distinctly exposed to asbestos in unique exposure events and in a wide variety of temporally separated, geographically distinct, and highly differentiated routes and circumstances. While Plaintiff had repeated or continuous exposures, Plaintiff's individual exposure is unique in time, location, form, and degree of asbestos contact, and as a result of which Plaintiff has been diagnosed with asbestos disease. Dates of Plaintiff's residence in the Libby area and exposure, including events of injurious exposure between July 1, 1973 and July 1, 1975 are: 1971 - 1992.

11.     At all times Plaintiff was ignorant of the nature and extent of the life threatening risks and injury involved, and would not have continued to be exposed to such an environment if he had known the true facts.

Complaint and Demand for Jury Trial                                                    2

12.     The Grace/Zonolite workers were not provided with coveralls or showers. As a result workers went home and into the community with asbestos dust on their clothing and in their cars, thereby extending the asbestos exposure. Similarly, invisible asbestos fibers from the mining operations infiltrated a broad variety of Libby area work sites, forests, recreation areas, homes, gardens, and numerous other distinct locations, resulting in hundreds of distinct routes and circumstances of exposure.

13.     As a result of failing to control dust from the mining, milling, processing, bagging, transport and a variety of uses of the vermiculite, workers, family members, members of the community, and others were exposed to the highly toxic asbestos.

14.     Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied, in the unique circumstances of his exposures, the options of avoiding exposure, demanding protective devices, demanding safer operations, changing jobs, or protecting himself and his family.

15.     The Montana State Board of Health ("BOH" or "Board") was created in 1907 under § 1474, RCM (1907). The BOH was responsible for the "general supervision of the interests and health and life of the citizens of the state." § 2448, RCM (1921); § 69-105, RCM (1947).

16.     The Montana legislature mandated that as a part of the BOH's "functions, powers and duties" that the Board "shall make sanitary investigations and inquiries regarding the causes of disease; . . . causes of mortality, and the effects of localities, employments, conditions . . . and circumstances affecting the health of the people." The BOH was further charged to "gather such information in respect to all these matters as it may deem proper for diffusion among and use by the people. . . ." § 2448, RCM (1921); § 69-105, RCM (1947) (as revised in 1961, Replacement, Vol. 4).

17.     The Montana Industrial Hygiene Act of 1939 Sections 2(1), (3) and (5), Ch. 127, L. 1939 (renumbered and codified at § 69-201-208, RCM (1947)) created within the BOH, an Industrial Hygiene Division (the Division) granting to the Division the powers to:

(1) make studies of industrial hygiene and occupational disease problems in

Montana industries; . . .

(3) make investigations of the sanitary conditions under which men and women work in the various industries of the State; . . .

(5) report to the industries concerned the findings of such investigations and to work with such industries to remedy unsanitary conditions.

18.     In 1955, the Industrial Hygiene Division was effectively eliminated by the legislative decree of § 69-201, RCM (1947)(1961, Replacement, Vol. 4) providing that the BOH "shall possess, exercise and administer all of the powers, functions and authority, and shall carry out, discharge and execute all of the duties, in the field of industrial hygiene" set forth in § 69-201-208, RCM (1947). Thus, the BOH became exclusively responsible for the State's programs for general public health and safety as well as occupational/industrial health and safety.

19.     § 69-105, RCM (1947) (1961, Replacement, Vol. 4) (effective 1955 to 1967) provided that the State Board of Health shall ". . . have general supervision of the interests of health and life of the citizens of the state," . . . "gather such information . . . as it may deem proper for diffusion," . . . and " . . . make sanitary investigations and inquiries regarding ... employments . . . ."

20.     In 1967, the Montana legislature revised the public health and industrial hygiene statues, creating the Department of Health (DOH). § 1, Ch. 197, L. 1967.  The creation of the DOH resulted in the functions and duties of the BOH being divided between the BOH and the new DOH.

21.     The DOH assumed the responsibility to "make investigations, disseminate information, and make recommendations for control of diseases and improvement of public health to persons, groups, or the public."  § 69-4110(3), RCM (1947) (1969, 2d Replacement, Vol.4).

22.     The DOH also became responsible for administering the industrial hygiene program (§ 69-4105(1), RCM (1947) (1969, 2d Replacement, Vol. 4)), requiring it to "investigate the conditions of work at any place of employment at any time," and to "report the findings of investigations to the industry concerned and co-operate with the industry in preventing or correcting  conditions which are hazardous to health." § 69-

4203(3) and (4), RCM (1947) (1969, 2d Replacement, Vol.4) .

23.     The Montana Industrial Hygiene Act (1967), § 20 *et seq*. Ch. 197, L. 1967,

provided:

> The state board of health shall adopt rules and approve orders to correct or
> prevent conditions which are hazardous to health at any place of
> employment.
>
> § 69-4202, RCM (1947) ( 1969, Replacement, Vol. 4).

> The State Department of Health shall:
>
> (1) make studies, make recommendations, and issue orders approved by the
> State Board on industrial hygiene and on occupational diseases; ...
>
> (4) report the findings of investigations to the industry concerned and
> cooperate with the industry in preventing or correcting conditions which are
> hazardous to health;
>
> (5) enforce provisions of this chapter, and rules adopted by the State Board.
>
> § 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4).

24.     § 69-4106, RCM (1947) (effective 1967 to 1971) provided that "The state

Board shall . . . (d) . . . enforce rules and standards . . . for the preservation of public

health and prevention of disease."

25.     § 69-4203, RCM (1947) ( 1961, Replacement, Vol. 4) (effective 1967 to

1971) provided that the Board of Health: "shall . . . (3) . . . investigate the conditions of

work . . . (4) . . . cooperate with the industry in preventing or correcting conditions which

are hazardous to health."

26.     The Montana Clean Air Act, § 69-3905, RCM (1967), provided as follows:

> It is hereby declared to be the public policy of this state and the purpose of
> this act to achieve and maintain such levels of air quality as will protect
> human health and safety.

§ 69-3909, RCM (1967) provided:

> In addition to any other powers conferred on it by law the [State Board of
> Health] shall: . . .
>
> (3) Issue such orders as may be necessary to effectuate the purposes of this
> act and enforce them by all appropriate administrative and judicial
> proceedings.

(4) Require access to records relating to emissions.

§ 69-3914, RCM (1967) further provided:

(1) Whenever the board has reason to believe that a violation of any provision of this act or rule made pursuant thereto has occurred, it may cause written notice to be served upon the alleged violator or violators. The notice . . . may include an order to take necessary corrective action within a reasonable period of time stated in the order.

27.     In 1971, the industrial hygiene statues were further revised by the

Occupational Health Act, (OHA) of Montana. § 1, Ch. 316, L. 1971; § 69-4206, RCM

(1947) (Supp. 1977). The policy and purpose of the OHA was:

(1) ... to achieve and maintain such conditions as will protect human health and safety, and to the greatest degree practicable, foster the comfort and convenience of the workers at any workplace of this state and enhance their productivity and well-being.

(2) To these ends it is the purpose of this act to provide for a co-ordinated statewide program of abatement and control of occupational diseases ....

28.     The OHA act mandated that the BOH (re-named the "Board of Health and

Environmental Sciences" by the OHA) adopt rules implementing the Act, establish threshold limit values of airborne contaminants, and issue orders necessary to carry out the Act. The OHA granted the Department powers that included a requirement that the DOH enforce orders issued by the Board, prepare and develop a comprehensive plan for the prevention, abatement and control of occupational diseases, determine "the degree of health hazard at any workplace" and "collect and disseminate information and conduct educational and training programs relating to the prevention and control of occupational diseases." § 69-4211.1(1), (3), (6) and (7), RCM (1947) (Supp.1977).

29.     Under the OHA, the Department also had the power to take enforcement actions and impose monetary penalties on violators of the OHA. §§ 69-4215 and 69-4221, RCM (1947) (Supp. 1977). Additionally, the OHA set forth a specific "emergency procedure" to be implemented by the Department upon discovering "a generalized hazard at a workplace" that "creates an emergency requiring immediate action to protect human health." § 69-4216(1), RCM (1947) (Supp. 1977). In such circumstances, the

Department was required to order the persons causing or contributing to the hazard to "reduce or discontinue immediately the emissions creating the hazard." § 69-4216(1), RCM (1947) (Supp. 1977). In the absence of a general condition creating an emergency, the Department was granted the power to order the persons responsible for the "emissions from an operation ... causing imminent danger to human health" to reduce or discontinue such emissions immediately. § 69-4216(2), RCM (1947) (Supp. 1977).

30. In 1978, the OHA was renumbered and became § 50-70-101, *et seq.* MCA. The public polices of the former state department of public health were extended through the department of public health and human services' charge to "(1) . . . protect and promote the public health, . . . [in that it]" shall: "(a) make inspections for conditions of public health importance and issue written orders for correction, destruction, or removal of the condition; (b) disseminate information and make recommendations for control of diseases and other conditions of public health importance; . . . ." § 50-70-102, MCA.

31. The 1972 Montana Constitution provides in Article II § 3 that all persons have the inalienable right "to a clean and healthful environment" and provides in Article IX § 1(1) that "the State and each person shall maintain and improve a clean and healthful environment in Montana . . . ."

32. In 1956 the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation at Libby, Montana "to determine if any of the components of this company were detrimental to the health of the employees." The 1956 report, p. 3, found high dust levels, that the dust contained asbestos, and that "the asbestos dust and the dust in the air is of considerable toxicity." It cited medical literature. The 1956 report found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The 1956 report, p. 6, states:

Full recognition should be given to the fact that direct control measures alone are usually not enough to insure safe working conditions. The method of operations, proper maintenance of equipment and of housekeeping are equally essential to maintain healthful conditions.

That until such time as the repair and maintenance of both the exhaust and ore conveying systems have been complete, all the men in the dry mill be provided with and required to wear an adequate respirator.

No further action was taken in 1956 and 1957.

33.    In 1958, the State Board of Health, Division of Disease Control, undertook another industrial hygiene study of the Zonolite mine and mill operation "to determine if any of the components of this company found to be detrimental to the health of the employees during the last study in August, 1956 had been reduced or alleviated since that time." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report, at p. 8, cites medical literature showing that asbestosis is "a progressive disease with a bad prognosis," often fatal. The report, at p. 8, finds that asbestos dust "concentrations had, as yet, not been reduced to a satisfactory level over all . . . The dry mill still required a considerable amount of work to reduce the dust in this area to an acceptable level." No further action was taken by the State Board of Health, Division of Disease Control in 1958, 1959, 1960, or 1961.

34.    In 1959, the State of Montana, State Tuberculosis Sanitarium treated Glenn Taylor, a Libby Zonolite mine worker, for shortness of breath and asbestosis.

35.    In 1961, the State of Montana, through formal death certificate reporting procedures, had notice that Glenn Taylor died of asbestosis, and that Charles Wagner, a mechanic at Zonolite in Libby, died of pulmonary fibrosis.

36.    In 1962, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Zonolite mine and mill operation "to determine if any of the components of the operations continued to be a threat to the health of the employees." The report again found dust levels far in excess of the asbestos limit, and recommended dust control measures. The report, at p. 4, concludes "as indicated in the findings of this study, it appeared that no progress had been made in reducing dust concentrations in the dry mill to an acceptable level and that, indeed, the dust concentrations had been increased, substantially, over those in the past." No further action was taken in 1962.

37.    In 1963, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill. The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures.

The report, at p. 3, found a "hazardous condition existing at this plant." No further action was taken in 1963.

38.     In April of 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if compliance with previous recommendations for the control of dust had been achieved." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report cited an article by Dr. Irving Selikoff (1964), finding dangerous levels of asbestos disease in asbestos insulation workers with "light intermittent exposure to asbestos." The State knew that the Libby workers had heavy and frequent exposure to asbestos. The 1964 report states at p. 3, "the asbestos content of the material with which you are working appears to provide some serious potential for the development of disease if not properly controlled. In addition, the discharge of large volumes of asbestos-laden dust at ground levels sets up a condition where all members of the plant can be exposed in addition to those who work in the dry mill." While still referencing the Selikoff article, the State's report noted that environmental exposure has been shown to cause lung abnormalities and a question of "possible widespread carcinogenic air pollution." The State's report identifies that "floating fibers do not respect job classifications," and that per Selikoff, "insulation workers undoubtedly share their exposure with workmates in other trades." The State cited to Selikoff for an example of asbestos fibers having been identified in individuals living near an asbestos factory, and noted that this demonstrates that exposure goes beyond employees and workmates, and into the surrounding community.

39.     In September, 1964, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine if the concentrations were excessive as has been found in many previous studies." The report again found dust levels greatly exceeding the asbestos limit, and recommended dust control measures. The report states at p. 3 "the dust discharged at ground level from the main dust collection fan was continuously contaminating the whole plant work area and needs to be either raised substantially so the dust-laden air discharges

substantially above the plant area or that cleaning be provided. There was much reentry of this dust into the working environment." The report concludes at p. 3 with the "hope that continued work to reduce dust concentrations will be done and that a continuous operation at acceptable levels will be achieved soon."

40.     In 1964, the State of Montana, through formal death certificate procedures, had notice that Albert Barney, a millworker at Zonolite in Libby died of cor-pulmonale.

41.     In 1966, the State of Montana, through formal death certificate reporting procedures, had notice that Walter McQueen, a miner from Libby, died of asbestosis.

42.     In 1967, the State Board of Health, Division of Disease Control, undertook an industrial hygiene study of the Grace/Zonolite mine and mill "to determine compliance with previous recommendations." The report, at p. 2, concluded "as in the past, the need for particularly close attention to the functioning of the dust control system, condition of duct work, . . . was apparent. It was also apparent that a strict housekeeping program must be maintained." No further action was taken by the State Board of Health, Division of Disease Control in 1967, 1968, 1969, 1970 and 1971.

43.     In November 1967, evidence was presented to the Chairman of the State Industrial Accident Board that another worker at the Grace/Zonolite mine and mill had been diagnosed with asbestosis from work in the warehouse.

44.     In 1974 the Montana State Department of Health performed an investigation of the airborne asbestos exposure at the Grace mine and mill. No action was taken.

45.     From 1967 to about 1974, Grace regularly reported on the status of dust control at its operations in Libby to the State of Montana.

46.     All the above described reports of the State of Montana, Division of Disease Control, were delivered to Grace, or its predecessor, Zonolite. None of the reports were made public, nor were the Grace workers, their families, or members of the Libby community warned of what the State had found.

47.     The State continued to receive additional notice of the nature and extent of the asbestos hazard to Grace workers, their families, and members of the Libby

community through a myriad of State agency activities and reports.

48.    In 1970, Grace applied to the State Board of Health for a variance from air pollution statutes (§ 69-3904 et. seq., RCM 1947). The State Board of Health granted Grace its desired exemption on September 11, 1970, thereby allowing Grace to continue its hazardous operations. Grace subsequently filed multiple renewal petitions for the variance, all of them based on Grace's representations to the State Board of Health that Grace needed to continue to operate the dry mill despite its inherent and previously identified problems with hazardous emissions. On September 27, 1974, the State Board of Health granted Grace its final variance.

49.    From 1970 to 1974, Grace requested, and the State granted, no less than seven variances or variance extensions. The State had the opportunity to deny the requests or require Grace to comply with industrial hygiene standards as a requirement of any variance. The State was aware throughout this whole period that Grace continued to fail in its asbestos dust control measures, and that as a result of its failures excessive and dangerous amounts of asbestos were being emitted in violation of applicable requirements. The State knew that these failures posed a risk to human health, yet it knowingly and willingly passed on these multiple opportunities to shut down Grace's operations or exercise any of its authority to bring Grace into compliance with applicable standards by denying or under threat of denying the variances.

50.    The State exercised its authority at the Grace Libby operations through the Department of Health and Environmental Sciences. Beginning in December 1970, the Department of Health and Environmental Sciences received permit requests from Grace seeking authority to construct many various dust control systems at multiple sites involved in Grace's Libby operation. Between 1971 and 1980, the Department of Health and Environmental Sciences granted Grace no fewer than six different permits on dust control measures. All but one was approved without any stipulations.

51.    By 1971, 14 workers at the Grace mine and mill had died of asbestos disease.

52.    The Department of Health and Environmental Sciences also conducted no

fewer than seven different inspections of Grace's Libby operations between April 1979 and October 1987. The State's notes from these inspections include a 1979 citation for violation of Air Contaminant Restriction based upon visible emissions from the dryer stack at the mill, and a 1987 discussion of "the asbestos situation at the mine with [Grace personnel]."

53.    In 1983, the Department of Health and Environmental Sciences received a report from the Environmental Protection Agency (EPA) regarding an epidemiological study of Libby Grace workers. The report identified to the State that 109 former Libby Grace employees had died, 16 workers had lung cancer, and two had mesothelioma, and that this was corroborative of written scientific opinion on the effects of asbestos exposure.

54.    The Department of Health and Environmental Sciences was involved in quantifying and analyzing the Grace operation. Notably, the State received information on the quantity of vermiculite processed at the entire operation, received and sought information regarding the asbestos contained in the vermiculite and the health risks posed by exposure. However, the State failed to take action despite its continuous and ongoing involvement.

55.    The Department of Health and Environmental Sciences wrote to Grace in 1987, seeking information on what it considered the "most important pollutant," identifying, "Asbestos associated with your entire operation." After this letter and inspection to Grace, the Department of Health and Environmental Sciences wrote to the EPA for information about the public health risk from asbestos exposure. The State's letter stated, in part, "In permitting the mining, concentrating, and milling of the vermiculite ore, the question of public health risk from asbestos exposure needs to be addressed."

56.    The Montana Department of State Lands was involved in conducting inspections of Grace's Libby mining operations pursuant to its permitting and oversight authority under mine reclamation statutes. (§ 50-1200 et. seq., RCM 1947). The Department of State Lands conducted inspections in 1975, 1979, 1985, 1987, and 1994.

Despite knowledge of the health hazard and asbestos content at the mine, the State continued to permit and inspect the Libby mine without taking any action on the problems associated with the asbestos.

57.     The Montana Department of State Lands regularly exercised its permitting and oversight authority of Grace's Libby operations. Beginning in November 1971, the Department of State Lands issued permits to, and received annual operating reports from, WR Grace until 1990. Despite specific knowledge of the asbestos hazard at Grace's Libby mining operation, the Department of State Lands authorized multiple permitting amendments to increase the mine size. In each instance the State determined that no environmental review was required. An environmental review is intended to evaluate impacts on both the environment and human health. The environmental review would have required the State to conduct a thorough analysis of the human health impacts from the mine, and the public process required by an environmental review would have revealed to the Libby community the impacts on human health from Grace's mining and milling operation.

58.     The Employment Relations Division (ERD) of the Montana Department of Labor an Industry separately tracked and regulated Grace and its Libby operation. The Safety Bureau inspected the Grace mine for compliance with state occupational safety and health codes, and the Workers Compensation Claim Assistance Bureau received notices of claims filed by workers for work-related injury or disease.

59.     Between June 1974 and February 1991, the Department of Labor and Industry conducted no fewer than 20 inspections of Grace's Libby operations. Many of these inspections generated citations and required abatement by Grace. One inspection, in October 1985, was conducted to become familiar with Grace's effort to minimize asbestos exposure to employees. At this same inspection, the State gave a safety presentation to Grace employees addressing back injury prevention and safety glasses. There is no record that the State discussed the asbestos hazard with Grace employees at this presentation. Despite its knowledge of the asbestos hazard at Grace, the Workers Compensation Claim Assistance Bureau reported in 1985 that it was not testing for

asbestos based on efforts by federal inspectors to sample asbestos at Grace twice per year, the frequent communication between federal officials and the Safety Bureau, and the access that the State had to federal inspection reports. In addition, the Claims Assistance Bureau administered a number of claims for asbestosis or lung related conditions involving Grace workers.

60.    From 1971-1991, a number of federal agency inspections of the Grace mine and mill showed violations of asbestos dust control requirements. The State of Montana was either a participant in, copied on the reports of, or had access to said inspections. Federal inspections in 1971, 1972, 1973, 1974 and 1975 found dangerous levels of asbestos dust at the Grace mine and mill. The State of Montana did nothing to warn the workers, their families, or the community of the dangers of asbestos disease.

61.    Following the closure of Grace's mine operations in approximately 1990, the State of Montana continued to inspect the Grace operation for occupational and environmental health hazards.

62.    The State had knowledge and notice throughout the period of Plaintiff's residence in the Libby area that Plaintiff was within the specific community that was at risk from the asbestos hazard created by Grace's Libby operations.

## FIRST CLAIM
## Negligence v. BNSF

63.    Paragraphs 1-62 above are incorporated by this reference.

64.    During the dates above stated, Plaintiff resided or remained in proximity to the real property of BNSF and was thereby exposed to asbestos dust from BNSF's property and operations. John Swing was a managing agent for BNSF in Libby, Montana, and as such is separately responsible for acts wrongful in this nature. Allegations herein as to BNSF's conduct and knowledge by this reference specifically include defendant John Swing.

65.    Throughout the years of exposure above stated, the Plaintiff lived in an environment that caused him to be exposed to and to inhale asbestos dust.

66.    At all times Plaintiff was ignorant of the nature and extent of the life

threatening risks and injury involved, and would not have continued to remain in such an environment if he had known the true facts.

67.    Without knowledge of the nature and extent of the asbestos hazard, Plaintiff was denied the options of avoiding exposure, demanding dust control or changing residence.

68.    At all times BNSF knew or should have known of the asbestos in the vermiculite, and knew or should have known of the hazards to human health of asbestos exposure and had a continuing duty to gather information, to prevent toxic dust from collecting upon and escaping from its property, and to warn Plaintiff and others who would be harmed by said dust.

69.    BNSF was negligent, as follows:

(a)    in failing to inquire, study and evaluate the dust hazard to human health;

(b)    in failing to take measures to prevent toxic dust from collecting upon and escaping from its property;

(c)    in failing to warn Plaintiff of the true nature of the hazardous effects of the dust; and

(d)    by acting in concert with Zonolite/Grace.

70.    As a direct and proximate result of the conduct of BNSF as described above, Plaintiff suffers from asbestos disease and asbestos related bodily injuries and has incurred the damages alleged herein.

## SECOND CLAIM
## Common Law Strict Liability v. BNSF

71.    Paragraphs 1-70 above are incorporated by this reference.

72.    Defendant BNSF failed to control asbestos contaminated vermiculite used in the operation of their business thereby causing Plaintiff to be exposed to asbestos, an extra hazardous and abnormally dangerous substance.

73.    Defendant BNSF engaged in abnormally dangerous activities thereby causing the release of asbestos contamination and exposure of Plaintiff to deadly asbestos. BNSF's business activities in handling, storing, transporting, loading, and using

asbestos and asbestos contaminated products were abnormally dangerous in that:

(a)   said business activities created a high degree of prior, present, and continuing contamination in the form of exceedingly toxic asbestos, which created a high degree of risk of harm to Plaintiff and others;

(b)   there was and is a strong likelihood that the harm resulting from said business activities and exposure to asbestos is great;

(c)   the risk of harm caused by BNSF's storing, handling, transporting, loading, and using asbestos contaminated vermiculite cannot be reasonably eliminated for those humans living and working in proximity to BNSF's abnormally dangerous business activity;

(d)   said business activities are not a matter of common usage;

(e)   BNSF's abnormally dangerous business activities were carried on within the town of Libby and adjacent areas, which were places that were inappropriate for the release of asbestos contamination; and

(f)   the dangerous attributes of the BNSF's business activities completely outweigh the value of those activities to the community.

74.   The dangers of the BNSF's business activities for the locality where Plaintiff resided, worked, or remained were so great that despite any usefulness of their activities and of the asbestos contaminated vermiculite under its control, BNSF should be required as a matter of law to pay for any harm caused.

75.   BNSF is strictly liable to the Plaintiff for damages caused by Plaintiff's exposure to deadly asbestos caused by BNSF's abnormally dangerous business activities.

76.   As a direct and proximate result of the BNSF's abnormally dangerous business activities, Plaintiff was exposed to unreasonably dangerous and hazardous materials, contracted asbestos related disease, Plaintiff suffers from asbestos disease and asbestos related bodily injuries and has incurred the damages alleged herein.

### THIRD CLAIM
### Negligence v. Robinson Insulation

77.   All paragraphs above are incorporated by this reference.

78.   For many years, Defendant Robinson Insulation obtained asbestos contaminated vermiculite from Libby, Lincoln County, Montana. Said asbestos contaminated vermiculite was transported by rail from Lincoln County to Great Falls, Cascade County, Montana, where Defendant Robinson Insulation expanded the asbestos

contaminated vermiculite and processed it into various manufactured products.

79.    After expanding the deadly asbestos contaminated vermiculite and
processing it into manufactured products, Robinson Insulation sold said vermiculite and
vermiculite products to the J. Neils/St. Regis Champion lumbermill in Libby and to
others for use and for resale in Libby, Montana. Said expanded vermiculite and
vermiculite products were transported from Great Falls back to Libby and delivered to
the said lumbermill and to other sites in Libby.

80.    Plaintiff was exposed to Defendant Robinson Insulation's unreasonably
dangerous asbestos contaminated products, which Robinson Insulation wrongfully placed
in the stream of commerce for use and consumption by the general public.

81.    During Plaintiff's period of exposure to asbestos and contaminated
vermiculite, which was generated and released by Robinson Insulation's business
activities, Robinson Insulation knew that extended exposure to asbestos was
unreasonably dangerous and hazardous to an individual's health. Nevertheless, Robinson
Insulation concealed and failed to disclose such knowledge to their employees, the
public, and the Plaintiff. Robinson Insulation gave no indication that it was unsafe and in
fact a serious health hazard for Plaintiff to be exposed to asbestos generated and released
by Robinson Insulation's business activities. Plaintiff was at all times ignorant of the
nature and extent of the life threatening risk involved in exposure to the asbestos
generated and released by Defendant's business activities.

82.    Robinson Insulation owed the Plaintiff a duty to act with reasonable care
concerning their business operations, so as not to jeopardize his health and welfare from
exposure to its asbestos contamination and asbestos products.

83.    Robinson Insulation breached its duty of care by negligently, carelessly,
and recklessly generating, handling, storing, releasing, disposing of, and failing to control
and contain unreasonably dangerous and hazardous asbestos created by and/or resulting
from its for profit business operations.

84.    Although Robinson Insulation knew or had ample reason to know that its
acts or omissions created a high degree of harm to the Plaintiff, it nevertheless

deliberately acted in conscious disregard of and indifference to the risk imposed upon the Plaintiff by his continued exposure to asbestos.

85.    As a direct and proximate result of Plaintiff's exposure to asbestos-laced vermiculite generated and released by Robinson Insulation's business activities, Plaintiff suffers from asbestos disease and asbestos related bodily injuries and has incurred the damages alleged herein.

## FOURTH CLAIM
### Strict Products Liability v. Robinson Insulation

86.    All paragraphs above are incorporated by this reference.

87.    At times relevant to this action, Defendants Robinson Insulation was engaged in the business of manufacturing, fabricating, modifying, expanding, labeling, distributing, supplying, selling, marketing, packaging, and/or advertising multiple products containing vermiculite. Said vermiculite was laced with deadly asbestos.

88.    Defendant Robinson Insulation knew and intended that the above referenced vermiculite and asbestos contaminated products would be used without inspection for defects therein or in any of their component parts and without knowledge of the hazards involved in such use.

89.    Defendant Robinson Insulation distributed and/or sold said asbestos-laced vermiculite products to the public, to the Plaintiff, and to one or more of Plaintiff's employers.

90.    Said asbestos-laced vermiculite products were defective and unreasonably dangerous for their intended purpose in that the inhalation of asbestos fibers causes serious disease and/or death to humans. The defect existed in the said products at the time they left the possession of Defendant Robinson Insulation. Said products did, in fact, cause injury and damage to Plaintiff, while being used in a reasonably foreseeable manner, thereby rendering the same defective, unsafe, and unreasonably dangerous for use.

91.    Plaintiff did not know of the substantial danger of using said asbestos-laced vermiculite products, nor was said danger readily recognizable by him. Defendant

Robinson Insulation further failed to adequately warn of the risk of contamination to which Plaintiff was exposed.

92.    As a direct and proximate result of the unlawful actions of Defendant Robinson Insulation and as a direct and proximate result of exposure to Robinson Insulation's unreasonably dangerous asbestos contaminated vermiculite products, Plaintiff suffers from asbestos disease and asbestos related bodily injuries and has incurred the damages alleged herein.

### FIFTH CLAIM
### Does A-Z

93.    All paragraphs above are incorporated by this reference.

94.    Does A-Z are corporations or persons unknown at this time whose negligence and wrongful acts caused asbestos disease in the Plaintiff. Plaintiff will seek to amend his complaint when the true names and capacities of Does A-Z are ascertained.

### DAMAGES

95.    All paragraphs above are incorporated by this reference.

96.    As a direct and proximate result of the acts of the Defendants, the Plaintiff has suffered and will suffer:

    a.    Loss of enjoyment of established course of life;

    b.    Loss of services which can no longer be performed;

    c.    Loss of earnings and/or earning capacity;

    d.    Physical, mental and emotional pain and suffering;

    e.    Medical expenses, rehabilitation expenses and related expenses;

    f.    Loss of insurability for medical coverage; and

    g.    Great grief and sorrow.

### PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for damages against the Defendants for each claim and for damages against other Defendants as follows:

    1.    Reasonable damages for lost enjoyment of established course of life, past and future;

    2.    Reasonable damages for loss of services which can no longer be performed;

3.   Reasonable damages for physical, mental and emotional pain and suffering, past and future;

4.   Reasonable damages for medical expenses, rehabilitation expenses, and related expenses incurred to date and reasonably certain to be incurred in the future;

5.   Advance payment of past and present medical expenses and special damages not reasonably in dispute;

6.   Reasonable damages for loss of earnings and/or earning capacity;

7.   Reasonable damages for grief and sorrow;

8.   For costs of suit;

9.   For such further relief as is just and equitable under the circumstances.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

DATED this ⟨Utr⟩ day of May, 2016.

McGARVEY, HEBERLING, SULLIVAN
& LACEY, P.C.

By: _____
ROGER SULLIVAN
ALLAN McGARVEY
JOHN F. LACEY
Attorneys for Plaintiff